Argued and submitted April 9, 2001, reversed and remanded June 12, 2002

## STATE OF OREGON,
*Appellant,*

*v.*

## CURTIS NEIL KIMSEY,
*Respondent.*

Z610761, Z610762; A107702 (Control), A107703
(Cases Consolidated)

47 P3d 916

Janet A. Metcalf, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Robert G. Thuemmel argued the cause for respondent. With him on the brief was Thuemmel & Uhle.

Landau, Presiding Judge, and Linder and Brewer, Judges.

LINDER, J.

.

## LINDER, J.

The state charged defendant with driving under the influence of intoxicants, ORS 816.010, reckless driving, ORS 811.170, and failure to perform the duties of a driver, ORS 811.700, arising from an automobile accident. Defendant's first trial ended in a mistrial after the prosecutor asked the state's witnesses questions that invited comment on defendant's right to remain silent. Upon discharging the jury, the trial court obtained the jurors' impressions of the case and conveyed those impressions to the prosecutor and defendant's counsel in an effort to encourage plea negotiations in the case. On retrial before a different trial judge, defendant moved to dismiss with prejudice, arguing that any retrial of the case should be barred under former jeopardy and due process principles because the information that the first trial judge conveyed to the parties assisted the state in bolstering its case. The trial court granted defendant's motion, and the state appeals. We reverse and remand.

To better frame the issues, we begin by describing in some detail the first trial and the circumstances that caused it to end in a mistrial. The charges against defendant arose out of an accident in which a sport utility vehicle veered onto a sidewalk and crashed into a utility pole. The driver got out of the vehicle and left the scene. Based on an eyewitness description of the driver, police arrested defendant several blocks away, gave him *Miranda* warnings, returned him to the scene, and then took him to the police station for questioning.

Defendant was charged and brought to trial. In opening arguments at trial, the prosecutor described the witnesses that the state would call and what she expected the evidence to show. Among other things, the prosecutor specifically told the jury that the state would call John Desimini, describing him as someone who saw defendant "flee from the driver's seat after the car had hit the telephone pole." Counsel for defendant did not identify any witnesses that the defense would call or evidence that the defense would present. Instead, defense counsel advised the jury that, after the state presented its evidence and defendant cross-examined

the witnesses, the evidence would raise "more questions than answers," as defense counsel would demonstrate at the conclusion of the trial.

The state's evidence established that, before the accident, defendant was in a bar drinking and buying drinks for others. The bartender took defendant's drink away after becoming concerned about defendant's intoxication level. Defendant then left the bar. Shortly afterwards, the accident occurred at an intersection in front of a state medical treatment facility. After the vehicle hit the pole, defendant entered the treatment facility, walked angrily past staff who were trying to block his entry and were telling him to leave, and left through the facility's back door. Desimini was one of the staff at the treatment facility who tried to block defendant after he entered. Desimini's testimony at trial revealed that, contrary to what the prosecutor described in the opening statement, other members of the hospital staff, not Desimini, were the individuals who told police that they saw defendant get out of the vehicle after the accident.

The officer who arrived at the scene of the accident observed that one of the doors of the vehicle was open and he was "fairly sure" that it was the driver's door. He also observed unopened beer bottles on the street, a "spider web fracture" in the windshield of the car, and a "clump of hair" on the rear-view mirror. The officer found a wallet containing defendant's driver's license on the floor on the driver's side and, elsewhere in the vehicle, he found money and other items. Using the description of defendant from the identification in the wallet and the information obtained from witnesses to the accident, the officer had a description of the suspected driver broadcast to other officers. Within minutes of the broadcast, a second officer who was about seven blocks from the accident scene spotted defendant and stopped him. That officer testified that defendant seemed to be intoxicated, had urinated in his pants, and did not have his wallet or other identification. The second officer arrested defendant and took him to the accident scene, where defendant acknowledged that he recognized the vehicle. Defendant had a fresh cut on his forehead and fragments of glass in his hair. After being transported to the police station, defendant fell asleep on a concrete bench. When he was later awakened, he

continued to show signs that he was impaired due to intoxication. Defendant agreed to take an Intoxylizer test. Although he did not blow hard enough to provide a sufficient breath sample, the insufficient sample nevertheless registered a blood alcohol concentration of .17 percent.

Before the state finished presenting its case, the trial court declared a mistrial. The mistrial occurred after the prosecutor twice asked the investigating officers if defendant denied driving the automobile. The first time the prosecutor did so, defense counsel objected, without stating the basis for the objection or moving for a mistrial; the court sustained the objection and told the jury to disregard the witness's answer. The prosecutor asked a similar question of the second officer, at which point defendant objected and, out of the jury's presence, moved for a mistrial on the ground that the questions called for the officer to comment on defendant's exercise of his right to remain silent. After assessing the prejudicial impact of the questioning in the context of the trial as a whole, the trial court granted defendant's motion for mistrial. The court declined, however, to dismiss the charges against defendant with prejudice, because it found that the prosecutor did not intend to comment on defendant's right to remain silent and that she asked the questions out of inexperience.

After the trial court declared the mistrial, the following exchange took place on the record:

"THE COURT:   * * * I am sending you back to the presiding court for a new trial date, but [what] I want to do is first talk with you about how to deal with the jury, and I don't want to send you back until I am finished with you, too.

"[DEFENSE COUNSEL]:   Okay.

"THE COURT:   Now, that I have heard all of the evidence that I have heard, not that I've heard all of it, it may be of use for the parties to talk with me, and maybe we can figure out a way, short of another full-blown jury trial on all these issues, to get the matters resolved.

"[DEFENSE COUNSEL]:   Sure.

"* * * * *

"[THE COURT]: Do the parties agree that I may simply go in and discharge the jury? I doubt that we are going to try the case in this jury term again, since the State needs witnesses and so forth. If you'll give me a few minutes to do that, then what I would like to do is talk with you, maybe just counsel first, and see if there are other ways to resolve this, now that everyone has had a look at what it really looks like, so give me a few minutes."

A recess immediately followed. When the proceedings resumed, the trial court stated that the jury had been discharged, that she had spoken briefly off the record with counsel for the parties, and that "[i]t didn't appear that there is any basis on which the case can be resolved short of another trial." With the understanding that a new trial date would be set, the proceedings were adjourned.

Approximately one month later, defendant filed a motion to dismiss, arguing that a retrial would violate his double jeopardy and due process rights because there had been "improper communication of juror information to the parties following the declaration of a mistrial * * * such that he [could not] receive a fair trial upon the retrial of this case." At the hearing on the motion, which was held before a different circuit court judge, the prosecutor and defense counsel described what transpired off the record in the first trial.[1] According to their descriptions, before discharging the jury, the first trial judge gave defendant the option of continuing the trial rather than accepting the mistrial because of the potential for the state's case to be stronger on retrial. Defense counsel declined, because he did not think that the empaneled jury was a favorable one for the charges against his client. The judge then left the courtroom to discharge the jury and was gone about 10 or 15 minutes. When she returned, she called the prosecutor and defense counsel into chambers to discuss the potential for the parties to resolve the case through plea negotiations. In discussing that prospect, the

---

[1] Defense counsel, who was present with another attorney who could question him, took the stand and testified under oath. Defense counsel also provided his written notes of what happened, which were made on the day that the mistrial was granted and were attached to the memorandum of law in support of his motion. Pursuant to defense counsel's stipulation, the prosecutor's statements as to what occurred were considered as if they were sworn and under oath.

judge described to counsel the jurors' reactions to witnesses and their views of the evidence up to that point. In particular, the judge informed counsel that "[f]our out of the six jurors had a substantial question about who was driving the car"; that the jurors were uncertain about where in the interior of the car the police found the wallet with defendant's identification and which side of the windshield was cracked; that the jurors considered the police officer who testified to be as "honest as the day is long"; that some of the jurors "bought" defense counsel's suggestion that some of defendant's symptoms may have related to the accident rather than intoxication, while others did not; and that some jurors thought the failure of police to administer field sobriety tests to defendant at the accident scene was a problem, while others did not.

The judge, who was aware that the state had needed to change prosecutors mid-proceedings, encouraged the parties to consider plea negotiations.[2] According to defense counsel's written notes, the judge commented that the jury that had just been discharged may have been a good one for defendant and that the state's case would be "tighter" if there were a retrial because the state would be better prepared. At the hearing on the motion, defense counsel testified that the judge said to him: "[S]o as you can see, if this case gets retried, it's probably going to get worse for you and not better." Defense counsel told the judge that he expected that any plea bargain that the state would offer would include a requirement of pleading guilty to one of the charges, which his client was unwilling to do. Without any further urging, the judge concluded that plea negotiations would not be successful and told the attorneys that she would send the case to the presiding judge for a new trial date.

Some time later, before the date set for the second trial, defense counsel received a supplemental police report, drafted between the two trial dates, identifying a witness who claimed to have seen defendant emerge from the vehicle

---

[2] The record reflects that, on the morning of the first trial, pretrial motions were handled by the deputy district attorney who had prepared the case for trial but who, for an unidentified reason, could not continue into the afternoon. As a result, following the noon recess, a second deputy district attorney was substituted as counsel for the state. That attorney had not been involved in the trial preparations and had not personally interviewed or subpoenaed the state's witnesses.

immediately following the accident. The prosecutor indicated that the state intended to call that witness. The prosecutor also gave defense counsel notice that the state might call two witnesses not called at the first trial: someone from the state crime laboratory who would testify regarding defendant's Intoxylizer result, and another police officer involved in defendant's arrest on the night of the accident, whose report defense counsel had received before the first trial.

At the hearing on the motion to dismiss, defense counsel argued that the judge's contact with the jurors was "one of the more irregular things I've heard from a judge, following a trial." Defense counsel urged that the prosecutor's conduct that prompted a mistrial and the judge's contact with the jury, in combination, should bar a retrial under double jeopardy and due process principles. Defense counsel acknowledged that, in granting the mistrial, the first trial judge expressly found that the prosecutor's questions that prompted the mistrial were not intentional. Defense counsel nevertheless urged that the mistrial should be considered "in tandem" with the judge's contact with the jury: "[T]he State is getting another crack at this case because of its own error to begin with, and then, in addition, [it is] getting the benefit of what the court added at the time."

Midway through the parties' arguments on the motion to dismiss, the trial court voiced its concern that the state had been able to obtain an additional witness because of the contact with the discharged jury in the first case. The prosecutor responded that the trial itself made it "obvious" that the state "had the wrong witness subpoenaed" and that the new witness came to light due to the testimony in the first trial, not because of any communication between the judge and the jurors. In particular, the prosecutor explained that the initial police report had caused the state to subpoena Desimini as the person who saw defendant driving. Desimini's testimony, however, made it clear that other staff at the facility were the ones who saw who had been driving the accident vehicle. The prosecutor urged that nothing precludes a party generally from procuring more evidence between a mistrial and a retrial and that a retrial should not be barred unless there was intentional or gross misconduct on the prosecutor's or judge's part. The prosecutor asserted

that the judge in the first trial had merely been acting as a "settlement judge" in communicating with the jury after the mistrial had been granted and the jury was to be discharged. In the prosecutor's view, that was not misconduct of any kind.

The trial court granted the dismissal with prejudice based on the "prior misconduct of the [prosecutor] and the court." In doing so, the trial court expressly found that "neither the [prosecutor] nor the judge had an intent to cause prejudice in this retrial of the case," that the prosecutor "innocently, and through inexperience" asked the questions that prompted the mistrial, and that the judge in the first case "had good motives in trying to get this case settled." The court concluded that it could not determine, one way or the other, whether the additional witness procured by the state for retrial was identified as a result of the first judge's contact with the jurors, or whether the prosecutor would have procured that witness and any other additional ones "in any event." Thus, the trial court could not affirmatively find actual prejudice. The court decided, however, that in the particular circumstances presented, prejudice should be presumed:

> "But in considering fairness issues, I believe * * * there's a presumption of prejudice where the state has had the benefit of the thinking and questions of the jury in the prior case which they shouldn't have had.

> "It does not strike me as * * * fair to put the defendant to a further trial based on this newly developed testimony. Because the—none of the mistakes made by the prosecutor or the trial judge were the fault of this defendant, and I can't say that he isn't prejudiced by a combination of the mistakes."

The trial court then dismissed the case with prejudice. In doing so, the trial court stated that it was granting the motion based on both the double jeopardy and due process grounds raised by defendant.

On appeal, the state challenges the dismissal, arguing that the trial court erred under both double jeopardy and due process principles. Specifically, the state contends that

neither the prosecutor's nor the judge's conduct was misconduct of a kind that triggers double jeopardy protection under either state or federal constitutional standards. Further, according to the state, actual prejudice must be established to bar a retrial; prejudice cannot be presumed. With regard to the due process analysis, the state argues that the trial judge in the first case did nothing suggesting bias or impartiality or other conduct that rose to the level of a due process violation.

Defendant responds that both state and federal double jeopardy principles bar a retrial, because the prosecutor's questions that prompted the mistrial were intentional and the first trial judge's motive in communicating with the jurors was "to secure a conviction." Moreover, according to defendant, the trial judge demonstrated bias in favor of the state by advising counsel of the discharged jurors' impressions of the case, which in turn made it impossible for defendant to receive a fair trial. Defendant therefore asserts that, as a matter of due process, the charges against him had to be dismissed with prejudice.[3]

We begin by examining whether defendant was entitled to a dismissal with prejudice under the double jeopardy provisions of the state and federal constitutions. The double jeopardy protection embodied in Article I, section 12, of the Oregon Constitution, is, in principle, the same as that embodied in the Fifth Amendment to the United States Constitution.[4] *See generally State v. Kennedy*, 295 Or 260, 272-76, 666

---

[3] On appeal, defendant renews his reliance on ORS 131.515 and ORS 131.525, which also embody double jeopardy principles. He does so only summarily, without discussion of their text and without development of his argument. The statutes, however, do not avail him. ORS 131.515 states the general rule that "[n]o person shall be prosecuted twice for the same offense." ORS 131.525(1)(a), however, provides an exception if a defendant "consents to the termination or waives, by motion * * * the right to object to termination" of the previous trial. A defendant's motion for mistrial satisfies the plain terms of that provision because it requests termination of the trial. Indeed, in that regard, the statute appears to be a codification of the long-standing understanding that, for constitutional purposes, a defense-requested mistrial is a waiver of the right to object to a subsequent prosecution. *See generally United States v. Scott*, 437 US 82, 93, 98 S Ct 2187, 57 L Ed 2d 65 (1978). Because defendant offers no analysis to the contrary, we do not consider his citation to the statutes further.

[4] Article I, section 12, of the Oregon Constitution, provides, in part: "No person shall be put in jeopardy twice for the same offence (sic)." The Fifth Amendment to the United States Constitution provides, in part: "No person shall * * * be subject for the same offense to be twice put in jeopardy of life or limb[.]"

P2d 1316 (1983) (concluding that the objective to be served by the two clauses is the same, even if the analyses adopted by Oregon and federal courts differ). The constitutional protection against double jeopardy is designed to spare a criminal defendant the embarrassment, expense, and harassment of being subjected to successive prosecutions for the same offense. *See generally State v. Rathbun*, 287 Or 421, 430, 600 P2d 392 (1979). But a defendant's protection against double jeopardy, like other constitutional interests, can be waived. Thus, when a defendant moves for a mistrial or otherwise consents to have a trial terminated, a subsequent trial on the same charges ordinarily is not barred. *Oregon v. Kennedy*, 456 US 667, 672-73, 102 S Ct 2083, 72 L Ed 2d 416 (1982); *Rathbun*, 287 Or at 430-31.

■ An exception to the usual rule can arise, however, when a mistrial results from prosecutorial or judicial misconduct. Such misconduct will, in a narrow range of circumstances, give rise to a double jeopardy bar on the theory that the official misconduct put the defendant "to the 'Hobson's choice' of either moving for a mistrial or continuing with a jury which was, arguably, favorably disposed to the defendant but is now contaminated by the misconduct." *Rathbun*, 287 Or at 431; *see also Oregon v. Kennedy*, 456 US at 672-73. Where the state and federal constitutional double jeopardy protections differ is the analyses that the courts have adopted for determining what kinds of official misconduct are sufficiently egregious to trigger a bar to retrial of the charges.

■ Under Article I, section 12, the state may not again prosecute a defendant on the same charges if the misconduct that prompted the defendant's successful mistrial motion "is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal." *State v. Kennedy*, 295 Or at 276. Thus, prejudice sufficient to warrant a mistrial is not enough, in and of itself. *State v. Pratt*, 316 Or 561, 579-80, 853 P2d 827 (1993). The official also must have acted with *knowledge* of the improper and prejudicial nature of the conduct and with at least *indifference* to the resulting mistrial. *Id.* In other words, the standard requires "some conscious choice of prejudicial action before the [double jeopardy]

guarantee bars correction of the error by a new trial. Negligent error, 'gross' or otherwise, is not enough." *State v. Kennedy*, 295 Or at 273 (footnote and some internal quotation marks omitted). *See also State v. Curl*, 65 Or App 227, 670 P2d 1058 (1983) (even gross negligence on part of prosecutor does not create a double jeopardy problem).

Under the Fifth Amendment, the test for barring a retrial is even more rigorous. Although it too focuses on the official's mental state in engaging in the misconduct, neither the official's knowledge that the conduct is improper and prejudicial nor indifference to the resulting mistrial will suffice. Rather, the official must actually *intend* the mistrial in the sense that the conduct in question is "intended to 'goad' the defendant into moving for a mistrial." *Oregon v. Kennedy*, 456 US at 676.

With those constitutional standards in mind, we first examine the prosecutor's conduct that prompted the mistrial in this case. For purposes of that analysis, we assume that the trial court properly exercised its discretion in determining that the prosecutor's questioning during the first trial was so prejudicial that it could be cured only by a mistrial.[5] The issue, then, is whether the prosecutor acted with the requisite mental state.

In that regard, as the state asserts, the trial courts' findings as to the prosecutor's mental state are fatal to defendant's double jeopardy claims. Both the first trial court, in granting the mistrial, and the subsequent trial court, in granting the motion for dismissal, found that the prosecutor's questions that caused the mistrial were asked innocently and out of inexperience. Those factual findings are the polar opposite of a conclusion that the prosecutor acted with knowledge of the improper and prejudicial nature of her questions and with intent to prompt or indifference to prompting a mistrial. The trial courts' findings are binding on review as long as there is evidence in the record to support them. *See State v. Hall*, 166 Or App 348, 356, 999 P2d 509 (2000) (citing *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)). In this case, there is.[6] Defendant does not argue otherwise, but merely

---

[5] The state does not argue otherwise on appeal.

[6] The prosecutor explained to both trial courts that, because defense counsel did not state a particular ground for objection, she misunderstood the basis for it,

asserts that we should reach a different conclusion (*i.e.*, that the prosecutor acted intentionally). That is not the nature of our review. Given the trial courts' binding factual findings, the prosecutor's conduct is not a basis for invoking either the state or federal constitutional bars to a retrial of the charges. *See State v. Fortune*, 112 Or App 247, 828 P2d 483, *rev den* 313 Or 627 (1992) (because trial court's factual findings refuted any conclusion that official knew her conduct was prejudicial and improper, trial court's dismissal with prejudice was reversed).

We turn, then, to the conduct of the trial judge who presided over the first trial. In granting the dismissal with prejudice, the second trial judge specifically and expressly found that the first trial judge acted with "good motives" in an effort to encourage plea negotiations. The state relies on that finding to argue that, even assuming some impropriety in the judge's communications with the jurors (a conclusion that the state disputes), the judge's mental state was not such as to give rise to a double jeopardy bar. In response, defendant accepts that the first trial judge was attempting to encourage plea negotiations. But defendant asserts that a trial judge's encouragement of plea negotiations in a criminal case amounts to impermissible judicial bias against a defendant because it is tantamount to an objective "to *secure the defendant's conviction without a further trial.*" (Emphasis in defendant's brief.) Defendant thus views this case as indistinguishable from *Rathbun*, in which a bailiff conveyed off-record and prejudicial information to jurors actively hearing a criminal case in a deliberate attempt to sway them to convict the defendant, in violation of the bailiff's oath and her statutory duties. *Rathbun*, 287 Or at 423-25.

The comparison does not withstand scrutiny, however. Plea negotiation in criminal cases is widely regarded as a legitimate and "essential component of an efficient and effective justice system," one that, if properly administered, "should be encouraged." *State v. McDonnell*, 310 Or 98, 103, 794 P2d 780 (1990); *see also Santobello v. New York*, 404 US 257, 260, 92 S Ct 495, 30 L Ed 2d 427 (1971) ("The disposition

---

believing at one point that the issue was whether police questioning must cease, and at another that the form of her questions were leading.

of criminal charges by agreement between the prosecutor and the accused sometimes loosely called 'plea bargaining,' is an essential component of the administration of justice. Properly administered, it is to be encouraged."). Under the statutes controlling the plea bargaining process in Oregon courts, trial judges may inquire into the status of plea negotiations and they are charged with an active supervisory role in approving any plea bargain ultimately negotiated between the prosecutor and the defendant. *See generally* ORS 135.432.[7] It simply is untenable to suggest, as defendant does, that for a trial judge to invite a prosecutor and a defense attorney to engage in plea negotiations necessarily equates with impermissible bias against a defendant and a design to preclude a fair resolution of that defendant's guilt or innocence.

Defendant further argues, however, that the particular facts of this case demonstrate that the first trial judge's motives crossed the line of neutrality and that she became an ally to the state by deliberately interviewing the jurors so that she could provide the state with an advantage on retrial that would cause defendant to want to plead guilty. Defendant asserts that "[i]t is whimsy to laud the court's 'good intentions' " because the trial judge's true motive in discussing the case with the jurors was to coerce defendant to plead guilty by "obtain[ing] private information" from the jury that would "help the state convict [defendant]" on retrial.

On this record, we disagree. Viewed in the context of the proceedings as a whole, the jurors' impressions of the case served largely to confirm what the parties and the trial judge, earlier in the case, had already discussed about the state's

---

[7] It is worth noting that this case does not involve a trial judge's actual participation in plea negotiations, which can pose other complications, such as the potential for a defendant to perceive the judge to be invested in a particular outcome to the negotiations. As do many jurisdictions, Oregon precludes the *trial* judge from participating in plea negotiations, although another judge may do so in an advisory capacity. *See generally* ORS 135.432 (identifying appropriate role for trial judge in plea negotiations); *U. S. v. Diaz*, 138 F3d 1359, 1362-63 (11th Cir), *cert den* 525 US 90 (1998) (discussing similar limitations on federal judges under Federal Rule of Criminal Procedure 11). Even so, a trial judge's active participation in plea negotiations has been held not to be a *per se* violation of any constitutional fair trial guarantee and a basis on which a defendant may automatically invalidate a plea or obtain a reversal of a conviction. *See Brown v. Peyton*, 435 F2d 1352 (4th Cir 1970), *cert den* 406 US 931 (1972).

evidence. Specifically, during the hearing on the mistrial motion, in assessing the prejudice of the prosecutor's conduct that prompted the mistrial, the trial judge had identified and discussed most of the same weaknesses in the evidence that the jurors later identified. In particular, the judge noted that the "hot issue" in the case was whether defendant was driving and that the state had only circumstantial evidence on that issue, such as the glass in defendant's hair and the hair on the rear-view mirror. The judge noted that, because of the lack of direct evidence, the jurors might not be persuaded beyond a reasonable doubt that defendant was the driver of the vehicle.[8] The uncertainties that the jurors later voiced to the trial judge—*e.g.*, their doubts about whether defendant was driving based on the circumstantial evidence regarding the cracked windshield and defendant's wallet—merely validated the trial judge's earlier assessment of the evidence. The only additional impressions conveyed by the jurors to the trial judge were ones that could have benefitted either side equally, if they benefitted the parties at all.[9]

In short, the circumstances amply confirm that the first trial judge's only objective was the neutral and appropriate one of realistically assessing the case in an effort to encourage a mutually acceptable and fair resolution of the charges without the delay and expense of a second jury trial. Contrary to defendant's position, nothing suggests that the trial court disclosed the jurors' impressions in a deliberate effort to leverage defendant into a plea bargain. Consequently, we need not decide whether or under what circumstances it might be improper for a trial judge to discuss a case

---

[8] In making those observations about the evidence to counsel, the trial judge's conduct was entirely appropriate, and defendant correctly does not argue otherwise. *See State ex rel Juv. Dept. v. Hayworth*, 35 Or App 161, 166, 581 P2d 100, *rev den* 284 Or 235 (1978) ("A judge formulates opinions as to the strength of a case as he hears the witnesses and views the evidence, and the fact that he informs counsel of the status of his opinion at a given stage of the proceedings does not indicate prejudgment.").

[9] For example, by learning that the jurors thought the investigating officer "was as honest as the day is long," the defense gained added incentive to undermine the police officer's credibility, if possible. Likewise, the defense learned that its strategy in suggesting that defendant's condition might have been due to the accident itself rather than intoxication had met with some success and that at least some jurors viewed the state's evidence of intoxication with suspicion because police had not performed any field sobriety tests.

with discharged jurors and to relay their impressions to the parties. Even if, in some circumstances, a judge's doing so can be deemed improper, double jeopardy principles require an examination of the judge's motives and mental state in engaging in the conduct before a retrial would be barred. Given this record as a whole, and the findings regarding the trial judge's motives in particular, there is no basis to conclude that the trial judge acted with knowledge that her conduct was prejudicial to defendant and with intent to impair or with indifference to impairing the fairness of any subsequent retrial. Thus, neither the state nor federal constitution requires a dismissal of the charges with prejudice.

■ The final question is whether a dismissal with prejudice was required under the federal Due Process Clause. Defendant argues that the "fairness" of any second trial is compromised because the state has obtained an undue advantage to strengthen its evidence. According to defendant, the prosecutor's conduct in prompting a mistrial gave the state the chance to see the weaknesses in its case (*e.g.*, the fact that it had subpoenaed the wrong witness from the treatment facility). Defendant argues that the trial judge then compounded the damage by conveying to counsel the jurors' impressions of the evidence that the state had produced up to the point of the first mistrial.

■ There are two problems with defendant's due process claim. First, it is questionable whether the federal Due Process Clause is a source of greater or different protection from a successive prosecution than the protection afforded by specific provisions of the Double Jeopardy Clause. *See generally Dowling v. United States*, 493 US 342, 352, 110 S Ct 668, 107 L Ed 2d 708 (1990) (although the Due Process Clause provides protections that are independent of the guarantees specifically enumerated in the Bill of Rights, that clause "has limited operation" beyond those guarantees); *Graham v. Connor*, 490 US 386, 109 S Ct 1865, 104 L Ed 2d 443 (1989) (due process does not impose additional requirements on state criminal processes beyond those imposed by the specific guarantees of the Bill of Rights). Second, as did defendant's double jeopardy arguments, defendant's due process argument depends on characterizing the judge as having been impermissibly biased. The mistrial, and the fact that the

state had an inherent chance to discover weaknesses in its case as a result of it, is not a basis for objection; that is simply one of the "harm[s] which always accompan[y a] retrial." *Arizona v. Washington*, 434 US 497, 516 n 35, 98 S Ct 824, 54 L Ed 2d 717 (1978). Thus, defendant's only objection can be that the fairness of the proceedings was unduly impaired by the conduct of the first trial judge. As federal courts have observed, a defendant seeking relief (usually reversal or recusal) on an assertion that he or she was deprived of a "fair trial" because of conduct of the trial judge amounting to bias or impartiality "faces a difficult task." *Gayle v. Scully*, 779 F2d 802, 806 (2d Cir 1985), *cert den* 479 US 838 (1986). For a defendant to prevail on such a claim, the trial judge must have intervened in the trial in such a way as to display obvious partiality by engaging in conduct that is both "significant and adverse to the defense 'to a substantial degree.' " *Id.* (quoting *Daye v. Attorney General*, 712 F2d 1566, 1572 (2d Cir 1983), *cert den* 464 US 1048 (1984)); *see also Rogers v. United States*, 609 F2d 1315 (9th Cir 1979) (for defendant to be denied due process, judge must not only inject self in trial in such a way as to compromise the judge's neutrality, but must do so in a way that in fact prejudices defendant's fair trial interests). For the reasons already discussed in analyzing defendant's double jeopardy claims, the trial judge's conduct in this case did not satisfy that federal standard.

Reversed and remanded.